

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00198-CR

_____

VICTOR L. ANDERSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1512410D

Before Pittman, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury convicted Victor L. Anderson of three counts of robbery and sentenced him to twenty years' confinement on each count. Anderson raises three points of error complaining that the evidence is insufficient to support his conviction, that the trial court erroneously denied his motion to suppress evidence, and that the State failed to prove beyond a reasonable doubt that he had committed the extraneous offense or bad act offered against him during the punishment phase of trial. We affirm the trial court's judgment.

### II. BACKGROUND

#### A. Robbery

Aaron Garcia was a manager and shift leader at Taco Cabana restaurant number 336 located on South Hulen Street in Fort Worth, Tarrant County, Texas, and brothers Lacamery and Lamarcus Deckard were restaurant employees.[1] Garcia drove Lacamery and Lamarcus to work on the morning of August 20, 2017, and they arrived at the restaurant at 5:00 a.m. They prepared food and readied the restaurant before it opened at 6:00 a.m. Each of the three employees was responsible for the restaurant's cash. Garcia unlocked the restaurant doors at 6:00 a.m.

---

[1]For clarity, we refer to the brothers by their first names.

At 6:05 a.m., a black man entered the restaurant carrying what appeared to be an M16 gun wrapped in a towel or a shirt. His face was covered with a black shirt, and only his eyes and forehead were visible. The man was wearing a shirt, a bluish hoodie sweatshirt or jacket, and gray sweatpants that were a bit short and had stripes down the sides. The man was possibly wearing jeans under them.

The man approached Lamarcus, who was signing in at the front register. The man shouted and instructed the employees to unlock the registers. The till from the first register was already on the counter, and the man took the $135 cash that was in it. The second register drawer had no till, and the man instructed the employees to go to the safe in the office at the back of the restaurant.

Garcia complied with the man's instructions to unlock the safe and handed him the four or five tills that were inside it. The safe was required to have $1,500, and each till typically contained $300 to $500. All of the tills that the man took contained cash, and one of the tills contained a debit card that managers were permitted to use for items such as out-of-stock products. After instructing the employees to get on the ground, the man left through the back door.

During the robbery, Lamarcus felt threatened, was afraid for his life, and wondered whether he would get out alive. Lacamery believed the man had a gun, feared for his and his younger brother's safety, and was afraid that the man might come back. Garcia was afraid of being hurt and was concerned for his employees' safety.

Garcia called 911, and the recording of that call was admitted in evidence without objection. Garcia, Lamarcus, and Lacamery were unable to successfully identify the robber from a photo lineup. Security camera recordings of the robbery and crime scene photos were introduced in evidence at trial without objection.

## B. Police Pursuit and Arrest

On the morning of August 20, 2017, Fort Worth Police Officer Richard Stutheit completed desk duty downtown at 5:45 a.m. and returned his patrol car to the west division. At the west division, Stutheit, who was still in his uniform equipped with a body camera, parked his patrol car and began loading personal items into his personal vehicle before driving downtown again to his part-time job where he provided security services for a church. Over his radio, Stutheit heard a call regarding a black male with his face partially covered who had robbed the Taco Cabana on South Hulen Street and was driving a black SUV or pickup truck. Although he was off-duty, Stutheit testified that he always had a duty to act as a police officer, even if he was out of uniform or not in a patrol car. Stutheit did not initially respond to the call because two on-duty officers who were closer to the restaurant were already responding.

While driving to the church at about 6:15 a.m., Stutheit observed a dark gray Chevy pickup truck stopped at least one and one-half car lengths behind the stop line at a red light located two miles from the Taco Cabana restaurant. When Stutheit looked to see whether the driver might be using a cell phone, he saw that the driver

4

was a black male wearing a white T-shirt and was leaning over and handling something in the passenger seat.

Recalling the initial robbery call, Stutheit requested additional information from the dispatcher about the robbery suspect and his vehicle, followed the truck onto Interstate 20 eastbound, and obtained the truck's license plate number. Using a law-enforcement approved pacing method, Stutheit, who was driving 80 miles per hour to keep up with the vehicle, estimated that the truck was traveling over 80 miles per hour in a 65 mile per hour speed zone. Stutheit observed the driver driving recklessly as he made several lane changes without signaling, drove the truck into a lane occupied by another vehicle, jerked and crossed the truck back into the shoulder lane momentarily, and came within a few feet of hitting a wall.

Because Stutheit had observed these traffic violations and the truck was now in the south sector of Fort Worth, Stutheit contacted the south division to send units to assist in making a traffic stop.[2] As he followed the truck, Stutheit continued to observe the driver committing traffic violations including driving over 80 miles per hour, changing lanes without signaling, and cutting across a lane of traffic to exit the highway ahead of another vehicle. When the truck stopped at a light, Stutheit stayed back because his vehicle's windows were not tinted, and the driver of the truck would have been able to see Stutheit's uniform. When the light turned green, the driver

_____

[2]Stutheit testified that it is against "Fort Worth policy" for an officer to initiate a traffic stop in a personal vehicle.

5

waited until the light turned yellow before driving the truck through the intersection. After making several turns, the driver turned the truck abruptly into a gas station parking lot but did not park the truck next to a gas pump. Stutheit activated his body camera as he parked directly behind the truck, which had pulled up next to an unknown man in a green shirt. As Stutheit was exiting his vehicle, the driver in the truck was handing paper currency toward the man in the green shirt, but no money was transferred.

To permit marked units to arrive and take over the investigation of the traffic violations and the driver's possible ties to the robbery, Stutheit approached the driver and told him to turn off the vehicle. In court, Stutheit identified Anderson as the driver of the truck that he had followed for five to ten minutes. When Anderson exited the vehicle, Stutheit saw paper currency in the truck's front seats.

The photographic and body camera evidence from the gas station encounter showed Anderson wearing a white T-shirt and gray sweatpants with striping down the sides. At the scene, Stutheit received still photographs from the restaurant security cameras that showed a black male wearing a gray sweatshirt, a white undershirt, gray sweatpants with a distinctive set of white stripes down the sides, and dark-colored shoes.

Marked police cars and on-duty officers arrived within three minutes. Anderson verbally consented to a search of the truck, but after seeing the cash in plain sight in the front seat of the truck, the officers decided to obtain a search

warrant. Anderson was initially arrested on two outstanding traffic warrants, and the police obtained a search warrant for the Chevy Silverado truck. During a search of the truck on August 21, 2017, Officer Jessica Wright found a Taco Cabana 336 Visa purchasing card, a T-shirt with a tire iron in it, a hooded sweater with a diamond-shaped emblem on the front, Anderson's Enterprise rental car agreement for the Silverado truck, four tills, and cash and rolled coins totaling more than $1,300 that were found near the driver's and front-passenger's seats of the truck. Wright testified that the tire iron in the T-shirt looked like a gun. One latent fingerprint of comparative value was found on one of the tills, but it did not match Anderson. Wright acknowledged that this is not uncommon: because a till is used by many people, it can be difficult to obtain fingerprints from it. The trial court admitted in evidence without objection Stutheit's body camera video recording, a map, photos of the truck, Anderson's clothing, loose paper currency, coins, and a purchase card found inside the truck.

Detective Harold Cussnick investigates robberies for the Fort Worth Police Department. Photographs of Anderson that were taken during his police interview shortly after his initial arrest show him wearing a white T-shirt and sweatpants with stripes down the sides, and Cussnick noted that Anderson's blue jeans could be seen under his sweatpants. The white T-shirt and sweatpants that Anderson was wearing that day were admitted in evidence. Anderson was subsequently arrested for the Taco Cabana robbery.

## C.    Anderson's Testimony

Anderson testified that around 4:30 a.m. on August 20, 2017, he left the company of a paramour in Crowley.  He was wearing blue jeans and a T-shirt, and as he was driving, he saw someone driving his truck that had been stolen a week earlier.  Anderson turned to follow his truck but gave up his search after thirty to forty minutes.  He drove into a parking lot and saw several men in an SUV parked near a dumpster.  When a constable drove near the men, the men fled, and Anderson saw one of them drop something.  After the men were gone, Anderson drove over to the dumpster and found a bag with coins and paper money and trays, along with some shirts, socks, and sweatpants.  Anderson put on the socks and pulled the sweatpants over his jeans and jumped into the dumpster to retrieve more paper money from the dumpster.  He placed the money on the front seat of the truck and placed the bag filled with money into his truck.  The bag with money broke after he placed it in his truck.

After he left, Anderson noticed that someone was following him in a car, and he became concerned that the men he had seen earlier had changed to a different vehicle.  Anderson panicked because the car changed lanes when he changed lanes.  Because the truck needed gas, Anderson eventually pulled into the gas station to buy fuel and to find out who was following him.  As he parked, Anderson saw a homeless person and was going to give him some money.  Anderson then saw a police officer

8

get out of the car. The jury rejected Anderson's explanation and convicted him of robbery by threat as charged in counts three, four, and five of the indictment.

## D.    Punishment

Jack in the Box restaurant manager Troylicia Riser testified during the punishment phase of trial. At about 4:00 a.m. on August 20, 2017, Riser and two coworkers, Alexis and Kelly, were working when a dark blue or gray truck quickly approached the restaurant. Riser, who was standing outside, tried to quickly reenter the restaurant, but before she reached the door, a man exited the truck and pointed what she believed was a gun wrapped inside a shirt toward her back. Riser was scared and thought she was in danger. Riser used the headset she was wearing to warn her coworkers that they were being robbed.

The man pushed Riser behind the counter, told her to open the cash register, and reached in to remove the till that had $150 in it. Riser ran to the back of the store, and as the man followed her, he caught Alexis, pushed her on the ground, and kicked her. When Riser attempted to help Alexis by pushing the man, the man pushed Riser against the ice machine and told her to open the safe. Riser told the man that she did not know the code for opening the safe, and Alexis tripped the man, who then dropped the money. The man picked up the money, and as he left, Riser ran after him and recorded him with her phone as he got into his truck and drove away. Afterward, Riser identified someone other than Anderson in a photo lineup.

The trial court admitted in evidence without objection a Jack in the Box surveillance camera recording along with still images from that video. Riser identified the images from the recording as accurately depicting the robbery. The video and images that were admitted in evidence and published to the jury show that the man who robbed the Jack in the Box restaurant was wearing sweatpants with stripes down the sides, a white shirt covered by a hooded shirt with a diamond-shaped emblem, and a black garment around his face.

Anderson also testified during punishment. He noted that no witness had identified him as the robber. Although Anderson agreed that the person in the Jack in the Box photo was wearing a sweater with a diamond logo and that a sweater with a diamond logo was found in his truck, Anderson denied that he was the person in the photograph. The jury assessed punishment for each count of robbery at twenty years' confinement, and the trial court sentenced Anderson in conformity with the jury's assessment.

## III. DISCUSSION

### A. Sufficiency of the Evidence

We first address Anderson's second point of error in which he contends the evidence is not sufficient to support his conviction. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004). Anderson specifically complains that none of the Taco Cabana robbery victims identified him as the person who robbed them. *See Johnson v. State*, 673 S.W.2d

10

190, 196 (Tex. Crim. App. 1984) (noting that State must prove that the party charged was the person who committed the offense or was a participant in its commission).

### 1. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court

11

conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements."). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

12

## 2. Analysis

### a. *Robbery Elements and Hypothetically Correct Jury Charge*

To prove robbery by threat, the State must prove that the accused, in the course of committing theft and with intent to obtain or maintain control of the property, intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02. The offense of theft occurs when a person unlawfully appropriates property with the intent to deprive the owner of the property.[3] *See id.* § 31.03(a).

Intent to deprive is determined from the accused's words and acts. *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. [Panel Op.] 1981). Evidence that an accused exercised control over property without consent of the owner, intending to deprive him of it, is always sufficient to prove theft. *Chavez v. State*, 843 S.W.2d 586, 588 (Tex. Crim. App. 1992). Consequently, if an accused is found in possession of recently stolen property and at the time of his arrest fails to make a reasonable explanation showing honest acquisition of the property, the jury may draw an inference of guilt. *Hardesty v. State*, 656 S.W.2d 73, 76 (Tex. Crim. App. 1983); *see*

---

[3]The term "[a]ppropriate" includes both acquiring and otherwise exercising control over the property. Tex. Penal Code Ann. § 31.01(4)(B). Appropriation is unlawful when: (1) it is without the owner's effective consent; or (2) the property is stolen and the defendant appropriates the property knowing it was stolen by another. *Id.* § 31.03(b). "Deprive" means to dispose of property in a manner that makes recovery of the property by the owner unlikely. *Id.* § 31.01(2)(C). An "[o]wner" is a person who has title to property, possession of the property, whether lawful or not, or a greater right to possession of the property than the defendant. *Id.* § 1.07(a)(35)(A).

*Adams v. State*, 552 S.W.2d 812, 815 (Tex. Crim. App. 1977) (holding that if accused offers explanation at time of arrest regarding possession of recently stolen property, record must show that explanation is either false or unreasonable before evidence supporting the conviction will be deemed sufficient; whether the accused's explanation for possessing stolen property is false or unreasonable is a question for factfinder); *see also Chudleigh v. State*, 540 S.W.2d 314, 317 (Tex. Crim. App. 1976) (holding that knowledge that property was stolen can be established by circumstantial evidence).

Counts three through five of the indictment[4] allege that Anderson, "in the County of Tarrant and State [of Texas] on or about the 20th day of August, 2017, did intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threaten or place" Lamarcus,[5] Garcia,[6] or Lacamery[7] "in fear of imminent bodily injury or death." Therefore, the State was required to prove: (1) that Anderson committed theft of property with the intent to obtain or maintain control of that property; and (2) that in

---

[4]At the commencement of trial, the State waived counts one and two of the indictment.

[5]Lamarcus Deckard is identified as the alleged victim in Count Three of the indictment.

[6]Aaron Garcia is identified as the alleged victim in Count Four of the indictment.

[7]Lacamery Deckard is identified as the alleged victim in Count Five of the indictment.

14

the course of this theft, Anderson intentionally or knowingly threatened Lamarcus, Garcia, or Lacamery or placed each victim in fear of imminent bodily injury or death. *See Jenkins*, 493 S.W.3d at 599; *Anderson v. State*, 461 S.W.3d 674, 679 (Tex. App.— Texarkana 2015, pet. ref'd).

>    b.    *Identity*

In asserting his sufficiency challenge, Anderson does not dispute that he was found in possession of the money, clothing, tire iron, tills, and purchasing card located in his car. Rather, he complains that the evidence is insufficient to establish his identity as the Taco Cabana robber. Because Anderson testified that others had robbed the Taco Cabana and that he came upon the clothes and money that had been abandoned after the robbery, he contends the jury's finding that he was the robber is irrational.

The lack of eyewitness identification is not dispositive of the identity element. Identity may be proven by circumstantial or direct evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Smith v. State*, 56 S.W.3d 739, 744 (Tex. App.— Houston [14th Dist.] 2001, pet. ref'd). "[I]dentity may be proven by inferences." *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd); *see also Smith*, 56 S.W.3d at 744 ("Identity may be proved through direct or circumstantial evidence, and through inferences."). When identity is at issue, we must consider the combined and cumulative force of all the evidence. *See Merritt v. State*, 368 S.W.3d

516, 526 (Tex. Crim. App. 2012). We do not employ a "divide-and-conquer" approach to reviewing the evidence. *Id.*

The evidence implicating Anderson was, by and large, circumstantial. In a circumstantial evidence case, it is not necessary that every fact point directly to the accused's guilt. *Livingston v. State*, 739 S.W.2d 311, 329–30 (Tex. Crim. App. 1987); *see Temple v. State*, 390 S.W.3d 341, 360–63 (Tex. Crim. App. 2013) (holding that circumstantial evidence allowed jury reasonably to infer guilt). The fact that a witness cannot positively identify a suspect is an issue to be weighed by the jury. *Livingston*, 739 S.W.2d at 329–30; *see Valenciano v. State*, 511 S.W.2d 297, 299 (Tex. Crim. App. 1974) (stating lack of positive identification is jury issue). When the State relies on circumstantial evidence, identification of the defendant is sufficient when, considered in relation to all the testimony and evidence, the conclusion is warranted by the combined and cumulative force of all the circumstances. *See Temple*, 390 S.W.3d at 360–63; *Livingston*, 739 S.W.2d at 330. A clothing description combined with other evidence regarding the circumstances of an offense has been held to be sufficient in a circumstantial-evidence case. *Livingston*, 739 S.W.2d at 330.

In this case, although no witness correctly identified Anderson in a photo lineup, the witnesses generally described the robber and his clothing and the vehicle he was driving. The depictions of the robber in the Taco Cabana security camera images comport with the witnesses' descriptions of the robber and his clothing. Within an hour of the robbery, Stutheit observed a truck that matched the description

16

of the vehicle the robber used and observed its driver committing various traffic violations. After the truck stopped at the gas station, police found Anderson driving the truck, which matched the one described by the robbery victims, and found that Anderson was in possession of cash, coins, tills, a Taco Cabana 336 purchase card, and a tire iron wrapped in a shirt, while also wearing and possessing the clothing described by the witnesses and as shown in the Taco Cabana surveillance video.

As noted, the jury is permitted to draw an inference of guilt if the defendant is found in possession of recently stolen property and at the time of arrest fails to make a reasonable explanation showing his honest acquisition of the property. *Hardesty*, 656 S.W.2d at 76; *Adams*, 552 S.W.2d at 815. Here, the jury was free to disbelieve Anderson's testimony suggesting that he found the cash, coins, till, and purchase card, his explanation that he innocently gained possession of the stolen items, and his assertion that someone else committed the aggravated robbery at the Taco Cabana. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (providing that factfinder is entitled to judge credibility of witnesses and can believe all, some, or none of testimony presented).

The combined and cumulative force of all the evidence was sufficient to permit a rational factfinder to find all the essential elements of robbery by threat beyond a reasonable doubt. Because this evidence is sufficient to support the jury's resolution of conflicting inferences and its finding that Anderson is the person who robbed the

victims, we defer to that resolution.  Because the evidence is sufficient to support Anderson's robbery convictions, we overrule Anderson's second point of error.

**B.      Unlawful Detention**

Prior to trial, Anderson filed a motion to suppress the evidence obtained from his truck on the basis that the evidence was improperly seized and was obtained as a result of an illegal stop, detention, arrest, and search in violation of his First and Fourth Amendment rights.  The trial court did not hear Anderson's motion to suppress before trial commenced.  After voir dire, defense counsel urged the trial court to rule on the suppression motion, and the trial court noted that it had stated on the preceding day that "it would be done during the trial."  Defense counsel urged the trial court to consider the motion to suppress before the State put on evidence that could damage Anderson's defense.  When the State offered and the trial court admitted in evidence the tire tool, T-shirt, sweater with diamond emblem, Taco Cabana purchase card, truck rental receipt, and tills, defense counsel stated, "No objection subject to our pretrial motion."  After the State closed its evidence and defense counsel had re-urged the motion to suppress, the trial court overruled the motion.  In his second point of error, Anderson complains that Stutheit unlawfully stopped him miles away from the alleged traffic offenses in violation of his Fourth Amendment rights, and that the trial court should have suppressed the evidence flowing from the stop.

18

### 1.    Standard of review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When

the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, as here, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than on evidence introduced later. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). But this general rule does not apply when the parties consensually relitigated the suppression issue during trial on the merits. *Gutierrez*, 221 S.W.3d at 687; *Rachal*, 917 S.W.2d at 809. If the State raised the issue at trial either without objection or with the defense's subsequent participation in the inquiry, the defendant is deemed to have elected to re-open the evidence, and we may consider the relevant trial testimony in our review. *Rachal*, 917 S.W.2d at 809. In this case, because the suppression motion was only litigated during the trial on the merits, the relevant trial evidence is the only evidence available for our consideration in reviewing the trial court's ruling on the motion. *Cf. Gutierrez*, 221 S.W.3d at 687

20

(explaining that review of suppression evidence is not limited to pre-trial evidence when suppression motion is relitigated during trial).

### 2. Warrantless Stop

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *State v. Martinez*, 569 S.W.3d 621, 623–24 (Tex. Crim. App. 2019) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986), *disavowed in part on other grounds by Handy v. State*, 189 S.W.3d 296, 298–99 n.2 (Tex. Crim. App. 2006)); *see, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623–24 (quoting *Russell*, 717 S.W.2d at 9); *Amador*, 221 S.W.3d at 672–73. If the State produces evidence of a warrant, the burden of proof shifts back to the defendant to show the warrant's invalidity. *Martinez*, 569 S.W.3d at 624 (quoting *Russell*, 717 S.W.2d at 9–10).

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful

21

temporary detention when he reasonably suspects that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Id.* The facts adduced to give rise to a reasonable suspicion need not show that a person has committed, is committing, or is about to commit a particular and distinctively identifiable penal offense. *Derichsweiler v. State*, 348 S.W.3d 906, 916–17 (Tex. Crim. App. 2011).

An officer has probable cause to stop and arrest a driver if he sees the driver commit a traffic offense. *State v. Gray*, 158 S.W.3d 465, 469–70 (Tex. Crim. App. 2005) (recognizing that section 543.001 of the Texas Transportation Code provides that any peace officer may arrest without warrant a person found committing a violation of the "Rules of the Road" under title 7, subtitle C); *see State v. Ballman*, 157 S.W.3d 65, 70 (Tex. App.—Fort Worth 2004, pet. ref'd); *see also* Tex. Code Crim. Proc. Ann. art. 14.01(b) ("A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view."). The record establishes that Stutheit observed Anderson drive at a speed in excess of the posted

22

speed limit, make multiple lane changes without using a turn signal, drive recklessly by driving into an occupied lane, jerk back into his lane, almost hit a wall, cut across multiple lanes before exiting the highway directly in front of another vehicle, and remain stopped at a green light before proceeding through an intersection during a yellow light. *See* Tex. Transp. Code Ann. §§ 545.104 ("An operator shall use the signal . . . to indicate an intention to turn, change lanes, or start from a parked position."), 545.401 ("A person commits an offense [of reckless driving] if the person drives a vehicle in wilful or wanton disregard for the safety of persons or property."); *Dogay v. State*, 101 S.W.3d 614, 618 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (officers who observed defendant speed and change lanes without using proper turn signals had probable cause to stop and arrest defendant); *cf. Wehring v. State*, 276 S.W.3d 666, 671 (Tex. App.—Texarkana 2008, no pet.) (holding that by failing to signal intent to turn and then turning in the presence of a peace officer, defendant committed traffic violation that reasonably permitted defendant's detention and did not require suppression of evidence gathered after lawful traffic stop). Given his observations of Anderson's traffic offenses, Stutheit, as a peace officer, was permitted to detain Anderson.

### 3. Delay in Effecting Stop and Stutheit's Off-Duty Status

Relying on *State v. Dixon*, 151 S.W.3d 271 (Tex. App.—Texarkana 2004), *aff'd*, 206 S.W.3d 587 (Tex. Crim. App. 2006), Anderson contends that Stutheit's failure to stop him immediately after observing his traffic violations rendered his later detention

23

unreasonable. In *Dixon*, the court of appeals focused on the trial court's finding that the 3.2-mile delay between the officer's observation of an unsignaled turn and the traffic stop was unreasonable. *Id.* at 274–75. However, the court of appeals emphasized that the trial court made a finding that nothing had prevented the officer from conducting the stop sooner and clarified that it was not holding that a 3.2-mile delay would be unreasonable in every case. *Id.* at 275. The Court of Criminal Appeals granted the State's petition for discretionary review but held that the dispositive issue in *Dixon* was not the delay between the purported traffic offense and the officer's traffic stop but was instead the trial court's determination that no traffic offense was in fact committed. *See Dixon*, 206 S.W.3d at 590–91. Anderson also suggests that Stutheit executed a stop in violation of department policy. We disagree with each of these contentions.

First, a police officer's discharge of police authority in the presence of criminal activity is not limited by the officer's off-duty status. *Morris v. State*, 523 S.W.2d 417, 418 (Tex. Crim. App. 1975) (citing *Wood v. State*, 486 S.W.2d 771 (Tex. Crim. App. 1972)). Consequently, while Stutheit was off-duty, he was not restricted from seeking to have Anderson stopped for traffic violations while he abided by police-department policy that barred him from making the stop in his personal vehicle.

Stutheit's delay in stopping Anderson arose directly from the fact that he was off-duty and driving his personal vehicle as he followed Anderson, and pursuant to police-department policy, Stutheit was unable to stop Anderson for the violations he

24

observed. During this delay, Stutheit called police dispatch to request that an on-duty officer in a patrol unit effectuate a stop for the continuing traffic violations that Stutheit was observing. There is no evidence in the record that Stutheit ever signaled to Anderson that he should stop. Stutheit followed Anderson for five to ten minutes and stopped when Anderson stopped, soon after Stutheit had observed Anderson recklessly exit the highway while driving in excess of 80 miles per hour and remain stopped at a green light before proceeding through an intersection on a yellow light. Stutheit's body camera shows that officers in a marked vehicle arrived at the gas station within three minutes after Anderson and Stutheit had stopped.

The trial court, which did not enter findings of fact or conclusions of law, could have reasonably inferred from the evidence that the police stop was fully effectuated within minutes by on-duty officers and was lawful. The evidence showed that Stutheit's detention of Anderson was reasonable based on Anderson's erratic driving and traffic violations and the fact that Anderson was driving a truck that matched the description of the robbery suspect's truck. The lawful stop and reasonable detention of Anderson did not bar the admission of evidence that Anderson sought to suppress.

Viewed in the light most favorable to the trial court's ruling, the evidence supports the trial court's implied findings, and the implied fact findings as supported by the record are also dispositive of the trial court's legal ruling. *See Garcia-Cantu*, 253 S.W.3d at 241; *Kelly*, 204 S.W.3d at 819. The trial court's denial of Anderson's

25

motion to suppress evidence was not error.  We overrule Anderson's second point of error.

## C.    Punishment Evidence

In his third point of error, Anderson complains that the trial court erroneously admitted evidence of an unadjudicated bad act during the punishment phase of trial because the State failed to prove beyond a reasonable doubt that Anderson had committed the bad act.  The State contends that Anderson failed to preserve this issue for our consideration and alternatively asserts that any error is not reversible.

We agree that Anderson failed to preserve this point of error for our consideration.  To preserve an error for this court's review, a defendant must make a timely and specific objection at the time the evidence is offered.  *See* Tex. R. App. P. 33.1(a)(1).  Anderson did not assert an objection in the trial court that comports with the complaint he now raises on appeal.  *See Nelson v. State*, 607 S.W.2d 554 (Tex. Crim. App. [Panel Op.] 1980) (stating that point of error in brief must comport to objection at trial).  By failing to object to such evidence at the time it was offered, Anderson has procedurally defaulted any error arising from the trial court's consideration of the prior bad act attributed to him.

Even if Anderson had preserved this point, he would not be entitled to relief.  During punishment, evidence may be offered as to any matter the court deems relevant to sentencing, including any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the

26

defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act. Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). However, the State need not prove all the elements of an extraneous offense for the offense to be admissible. *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005); *Spence v. State*, 795 S.W.2d 743, 759 (Tex. Crim. App. 1990).

Before the jury can consider this type of evidence in assessing punishment, it must be satisfied beyond a reasonable doubt that the bad acts are attributable to the defendant. *Haley*, 173 S.W.3d at 515. The statute requires the burden of proof beyond a reasonable doubt to be applied to a defendant's involvement in the act itself, instead of the elements of a crime necessary for a finding of guilt. *Id.* The State need not prove every element of a criminal offense, and a finding of guilt is not required. *See Gomez v. State*, 380 S.W.3d 830, 839 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

Although Riser did not identify the person who robbed the Jack in the Box restaurant where she worked on the morning of August 20, 2017, other evidence was admitted without objection that shows a dark truck driving to the front of the restaurant and a man with his face covered, wearing gray sweatpants with stripes down the sides and a white shirt covered by a hooded sweatshirt bearing a diamond logo entering the restaurant and holding something that looked like a gun wrapped in a cloth against Riser's back. The evidence is sufficient to establish beyond a

27

reasonable doubt that the bad act depicted by the evidence admitted during punishment is attributable to Anderson.  We overrule Anderson's third point of error.

## IV.  CONCLUSION

Having overruled Anderson's three points of error on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 6, 2019